FILED
U.S. District Court
District of Kansas
10/09/2026
Clerk, U.S. District Court
By: KGS Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**ZACKERY J. ASKINS,**

**Plaintiffs,**

**v.** **CASE NO. 26-3048-JWL**

**LAURA A. PROFFIT, et al.,**

**Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff Zackery J. Askins is a military prisoner currently incarcerated at the Midwest Joint Regional Corrections Facility ("MJRCF") at Fort Leavenworth, Kansas. Plaintiff brings this pro se civil rights action under 28 U.S.C. § 1331. The Court granted Plaintiff leave to proceed in forma pauperis.[1]

## I. Background

The Court screened Plaintiff's Second Amended Complaint (Doc. 11) ("SAC") and entered a Memorandum and Order (Doc. 12) ("M&O") ordering Plaintiff to show good cause why his request for monetary damages, his requests for Defendants' reassignment or termination, any individual capacity claims, and his claims against Defendant Hansen, Deputy Commander, should not be denied or dismissed for the reasons set forth in the M&O. (Doc. 12, at 13.) Plaintiff filed a response (Doc. 17). Plaintiff has also filed a Motion to Submit Support Document (Doc. 28). The Court grants the motion to the extent that the Court has considered the attached documents as part of his response to the M&O and his response to the *Martinez* Report.

[1] The Court notes that Plaintiff filed a "Notice to the Court" (Doc. 18) setting forth his difficulties receiving a certified account statement for purposes of seeking leave to proceed in forma pauperis in his case in the Western District of Oklahoma. Plaintiff attached an account statement to his ifp motion in this Court (Doc. 2–1) and the Court granted him leave to proceed in forma pauperis (Doc. 7). The Court will not be taking any further action on Plaintiff's notice at Doc. 18. If Plaintiff needs an extension or other relief in his case pending in the Western District of Oklahoma, he should seek relief from that court in that case.

The Court also found in the M&O that the proper processing of Plaintiff's claims seeking injunctive relief could not be achieved without additional information from appropriate MJRCF officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). The Court ordered the MJRCF officials to prepare and file a *Martinez* Report addressing Plaintiff's requests for injunctive relief and including any information pertaining to exhaustion and justiciability. *See Nauman v. Wormuth*, 2024 WL 776100, at *6 (D. Kan. 2024) (discussing two-part test to determine whether a military plaintiff's claim is justiciable). The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiffs' claims under 28 U.S.C. § 1915A." (Doc. 12, at 10.) The *Martinez* Report (Docs. 19, 20) (the "Report") has been filed, and Plaintiff has filed a response to the Report (Doc. 27). The Court's screening standards are set forth in the Court's Memorandum and Order at Doc. 10. *See* Doc. 10, at 5–6.

Plaintiff's claims in the SAC are set forth in detail in the M&O.[2] Plaintiff names as defendants: Laura A. Proffit, Commander; and Stephen Joseph Hansen, Deputy Commander. For relief, Plaintiff seeks "return or replacement items; financial recompence, as outlined; removal, reassignment, or relief of parties." (Doc. 11, at 5.)

## II. Motion for Appointment of Counsel

Plaintiff has filed a Motion for Appointment of Counsel (Doc. 26). Plaintiff argues that he is a layman at law, he is indigent, he has limited access to the law library, and his case is unique and will require extensive research and investigation. (Doc. 26, at 1–2.)

[2] The Court notes that Plaintiff has filed a "Declaration in Support of SAC" (Doc. 25) in which he sets forth allegations regarding responses to DD Form 510s regarding the facility's policy on educational books. Plaintiff acknowledges that this issue was not ripe "as Plaintiff was in the process of fully exhausting remedies as is required by the Prison Litigation Reform Act." (Doc. 25, at 1.) This claim is not part of the operative complaint, and the Court will not be taking any action on Plaintiff's Declaration.

The Court has considered Plaintiff's motion for appointment of counsel. The Court denies the current motion for the same reasons set forth in the Court's Memorandum and Order denying his previous motion for appointment of counsel. *See* Doc. 10, at 1–3. Thus, the Court denies the current motion without prejudice to refiling if this matter survives screening.

**III. Claims Subject to Dismissal**

The Court found in the M&O that Plaintiff is only entitled to assert official capacity claims for injunctive relief. The Court ordered Plaintiff to show good cause why his request for monetary damages, his requests for Defendants' reassignment or termination, any individual capacity claims, and his claims against Defendant Hansen, Deputy Commander, should not be denied or dismissed for the reasons set forth in the M&O. (Doc. 12, at 13.) Plaintiff has filed a response (Doc. 17) to the M&O.

The Court ordered Plaintiff to show good cause why any request for monetary damages should not be denied based upon the *Feres* doctrine. (Doc. 12, at 3–4) (citing *Feres v. United States*, 340 U.S. 135 (1950)). In his response, Plaintiff points to the opinions by Justices Thomas and Sotomayor in *Beck v. United States*, calling into question the relevancy of the doctrine. (Doc. 17, at 1–2.)

In *Beck*, the United States Supreme Court denied the petition for certiorari. *See Beck v. United States*, 146 S. Ct. 405 (2025). The statement by Justice Sotomayor addresses the denial of certiorari, stating that Justice Thomas rightly explains in his dissent that *Feres* "is a difficult decision to justify." *Id.* at 405 (citing THOMAS, J., dissenting from denial of certiorari). In the statement, Justice Sotomayor explains that *Feres* has worked harm in depriving "servicemembers and their families of redress for serious harms they have suffered during service to this country . . . even in in circumstances far removed from the expected risks of military service." *Id.* (citation

omitted). The statement provides that "[i]t has, for example, barred recovery for claims arising from medical malpractice, sexual assault, and (as here) car accidents, even when those harms occur on U.S. soil, bear little relation to the military itself, and just as easily could have befallen any American civilian." *Id*. (citation omitted). However, Justice Sotomayor states that:

> Even so, out of respect for the Court's rules of *stare decisis*, and in recognition of the reliance interests that *Feres* has generated, I vote to deny this petition for a writ of certiorari. Beyond the "special justification" that is needed to overrule any of our precedents, *stare decisis* has "enhanced force" on questions of statutory interpretation. *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 456, 135 S. Ct. 2401, 192 L.Ed.2d 463 (2015). That is because, unlike with decisions of constitutional dimension, "Congress exercises primary authority" over statutory questions "and 'remains free to alter what we have done.' " *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 799, 134 S. Ct. 2024, 188 L.Ed.2d 1071 (2014); see *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754, 765, 131 S. Ct. 2060, 179 L.Ed.2d 1167 (2011) (explaining the " ' "special force" ' . . . of *stare decisis* with regard to questions of statutory interpretation"). This "respect for Congress's decision not to intervene promotes the separation of powers by requiring interested parties to resort to the legislative rather than the judicial process to achieve their policy goals." *Groff v. DeJoy*, 600 U.S. 447, 474–475, 143 S. Ct. 2279, 216 L.Ed.2d 1041 (2023) (SOTOMAYOR, J., concurring). Moreover, the "justification for statutory *stare decisis* is especially strong" when Congress has considered but "spurned multiple opportunities to reverse" the Court's interpretation of a statute. *Id*., at 475, 143 S. Ct. 2279.
>
> That is the case here. Congress has often considered legislation that would overrule or limit the *Feres* doctrine. See, *e.g.*, H. R. 1517, 112th Cong., 1st Sess., § 4 (2011); S. 1347, 111th Cong., 1st Sess., § 2 (2009); H. R. 2684, 107th Cong., 1st Sess., § 1 (2001); S. 347, 100th Cong., 1st Sess. (1987). Indeed, Congress most recently did so in 2019, see S. 1790, 116th Cong., 1st Sess., § 729 (amendment as passed in the House), but ultimately decided to provide payments for certain service-related medical-malpractice claims under the Military Claims Act rather than the FTCA, see National Defense Authorization Act for Fiscal Year 2020, § 731, 133 Stat. 1457–1460, 10 U.S.C. § 2733a.
>
> Congress, therefore, is "undoubtedly aware of " the problems posed by *Feres* and "can change [*Feres*] if it likes." *Allen v. Milligan*, 599

> U.S. 1, 39, 143 S. Ct. 1487, 216 L.Ed.2d 60 (2023). "[U]ntil and unless it does, statutory *stare decisis* counsels our staying the course." *Ibid.* I write, however, to underscore that this important issue deserves further congressional attention, without which *Feres* will continue to produce deeply unfair results like the one in this case and the others discussed in Justice THOMAS's dissenting opinion. *See post*, at 409–410.

*Id*. at 405–06.

In his dissent, Justice Thomas states that the court did not need to overrule *Feres* because "Staff Sergeant Beck was not killed incident to military service at all . . . [h]e was killed in Missouri while off duty and going home to eat lunch with his family." *Id*. at 406. Although Justice Thomas states that the Supreme Court should have granted certiorari in the case, nothing in his dissent or Justice Sotomayor's statement overrules *Feres*.

In Plaintiff's case, his claims are based on his conditions while incarcerated at the MJRCF. This Court has stated that a plaintiff's status as a military prisoner dictates that his constitutional claims arise incident to military service. *Coleman v. Johnston*, 2021 WL 638020, at *2 (D. Kan. 2021). The Court cited the Tenth Circuit's findings in *Ricks* as follows:

> At the time he filed the original complaint, Ricks was serving his sentence at the USDB in Fort Leavenworth, Kansas. The USDB is the Army Corrections System maximum custody facility and provides long-term incarceration for enlisted and officer personnel of the armed forces. No civilians are confined at the USDB. The USDB is run by the Commandant, a United States Army military police officer. Military police serve as correctional officers at the USDB, which does not employ civilian guards.

*Id.* (quoting *Ricks v. Nickels*, 295 F.3d 1124, 1126 (10th Cir. 2002) (rejecting military prisoner's *Bivens* claim under the *Feres* doctrine; plaintiff, although discharged, remained subject to the Uniform Code of Military Justice (UCMJ)). This Court noted that the Tenth Circuit "held that Ricks' alleged injuries stemmed from his military relationship such that it is incident to his military service, where he was convicted in a military court for offenses committed during active duty; was

confined in a military institution commanded and operated by military personnel, subject to the USDB's rules and regulations; and was subject to the UCMJ and could be tried by court-martial for offenses during incarceration." *Id*. at *3. "Likewise, any claim Plaintiff may be making for monetary damages is 'incident to military service' and therefore barred by the *Feres* doctrine." *Id.*

Justice Sotomayor's statement notes that Congress has often considered legislation that would overrule or limit the *Feres* doctrine, "but ultimately decided to provide payments for certain service-related medical-malpractice claims under the Military Claims Act rather than the FTCA . . .." *Beck*, 146 S. Ct. at 405–06. Plaintiff acknowledges in his response that he attempted to file claims under the Military Claims Act. Those claims are addressed below. Plaintiff has not shown good cause why his request for monetary damages is not barred by the *Feres* doctrine. Plaintiff's claims for monetary relief are denied.

The Court also ordered Plaintiff to show good cause why any request for Defendants' reassignment or termination should not be denied. (Doc. 12, at 5) (citing *Nicholas v. Hunter*, 228 F. App'x 139, 141 (3rd Cir. 2007) ( "The remaining relief requested is not available as the District Court lacks authority to order a federal investigation and prosecution of the defendants or the termination of their employment."); *Goulette v. Warren*, No. 3:06CV235-1-MU, 2006 WL 1582386, at n.1 (W.D. N.C. June 1, 2006) ("The Court notes that even if Plaintiff's claims prevailed in this case, this Court would not, based upon this law suit, have the authority to order the termination of the Defendant's employment or to grant Plaintiff an immediate, early release from jail."); *Martin v. LeBlanc*, No. 14-2743, 2014 WL 6674289, at n.1 (W.D. La. Nov. 24, 2014) (finding that where plaintiff requested an investigation, the termination of the defendants' employment and the closure of the prison, "[s]uch relief is not available in this action"); *Merrida v. California Dep't of Corr.*, 2006 WL 2926740, at n.1 (E.D. Cal. Oct. 11, 2006) (finding that

where plaintiff prays for the termination of defendant's employment, "the court cannot award this form of relief to plaintiff) (citing 18 U.S.C. § 3626(a)(1)(A)).

In his response, Plaintiff addresses his request to have Commander LTC Laura A. Proffit reassigned, and states that she has been reassigned and replaced by LTC Kraut. (Doc. 17, at 4.) He argues that new commanders should inherit the issues of their predecessors. *Id*. Plaintiff also continues to argue that Deputy Commander Hansen should be terminated. *Id*. at 5. In support of his request, he attempts to distinguish cases cited by this Court in the M&O. *Id*. He argues that in *Goulette*, the case was dismissed for failure to exhaust administrative remedies and therefore "failed to reach a stage in which a Court could take actions of Mr. Goulette's claims." *Id*. He also argues that in *Martin*, the court found that that Deputy Warden Poret did not in fact use excessive force. *Id*. Plaintiff asks the Court to refer the findings of this case to the District Attorney's office to coordinate with the Fort Leavenworth Staff Judge Advocate General to pursue criminal charges against Deputy Commander Hansen. *Id*. at 5–6. Plaintiff argues that the Deputy Commander is a general services civilian employee and therefore the Court has jurisdiction over him. *Id*. at 6.

Plaintiff's attempt to distinguish the cases cited in the M&O is unpersuasive. Although Plaintiff seems to be arguing that the statements made in those cases were dicta and not necessary to the ruling, those statements were still made and reflect that courts do not have authority to grant such relief. Furthermore, the Court cited other cases to support the conclusion that this Court does not have authority to terminate employment or transfer defendants to other locations. *See Nicholas*, 228 F. App'x at 141; *see also Stugart v. Wiebers*, 2026 WL 18616, at *4 (D. Neb. 2026) (finding that the court lacks authority to terminate or force a defendant to resign from their employment) (citations omitted); *Nicholas v. Heffner*, 228 F. App'x 139, 141 (3rd Cir. 2007) ("The

remaining relief requested is not available as the District Court lacks authority to order a federal investigation and prosecution of defendants or the termination of their employment.").

Further, the Court is not authorized to direct state or federal prosecutorial authorities to bring a criminal case against any of the Defendants. *See Maine v. Taylor*, 477 U.S. 131, 136 (1986) ("the United States and its attorneys have the sole power to prosecute criminal cases in federal courts"); *Lynn v. Cline*, 2019 WL 2578241, at *2 (D. Kan. 2019) ("This Court cannot order the initiation of criminal charges, which is a decision within the discretion of prosecuting attorneys.") (citing *Presley v. Presley*, 102 F. App'x 636, 636–37 (10th Cir. 2004) (holding that a court order for "investigation and prosecution of various people for various crimes" would "improperly intrude upon the separation of powers")).

Plaintiff has failed to show good cause why his request for monetary damages, his requests for Defendants' reassignment or termination, any individual capacity claims, and his claims against Defendant Hansen, Deputy Commander, should not be denied or dismissed for the reasons set forth in the M&O. Plaintiff's requests for monetary damages and requests to have Defendants terminated, reassigned, or criminally charged are denied. Plaintiff's individual capacity claims and claims against Defendant Hansen are dismissed.

**III. Remaining Claims**

The Court found in the M&O that Plaintiff may be entitled to injunctive relief. *See Walden v. Bartlett*, 840 F.2d 771, 775 (10th Cir. 1988) (allowing claims for injunctive and declaratory relief against military officials); *Rios v. Commandant*, 100 F. App'x 706, n.1 (10th Cir. 2004) (unpublished) (noting that the court has held that "[a military prisoner's] claims for injunctive and declaratory relief [were] not barred by the *Feres* doctrine.") (quoting *Walden*, 840 F.2d at 774).

Plaintiff states that he is seeking the return or replacement of his property. In the

attachment to his SAC, he mentions that his religious texts and a religious pendant (Valknut) were seized. (Doc. 11–1, at 1.) Plaintiff claims that other property was seized such as legal documents, or religious items, "or in some cases items required per the MWJCRF packing list, that were brought to MWJCRF." *Id*. The return or replacement of his religious text and Valknut is the only specific injunctive relief Plaintiff seeks in his SAC.

The PLRA contains new standards for awarding prospective relief, *see* 18 U.S.C. § 3626(a), and provides a mechanism for defendants to seek termination of prospective relief, *see* 18 U.S.C. § 3626(b). Federal law provides for appropriate remedies with respect to prison conditions as follows:

> **(a) Requirements for relief.--**
> **(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a). Any request for injunctive relief must specify the relief requested. *See* Fed. R. Civ. P. 65(d)(1)(B) and (C) (requiring any order granting an injunction to state its terms specially and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required").

The Court noted in the M&O that:

> Plaintiff has not shown that prospective injunctive relief would remedy some of his complaints. He argues that his medical records were not sent to MCFP Springfield while he was in custody there.[3] (Doc. 11–1, at 3.) He also claims that he was not allowed to

[3] MCFP Springfield is a BOP administrative security federal medical center located in Springfield, Missouri. *See* https://www.bop.gov/locations/institutions/spg/ (last visited Oct. 6, 2026).

> use the restroom while he was in the hospital for treatment in August of 2025. *Id*. at 5. Plaintiff also claims that he was not allowed to submit paperwork for his parole board proceedings when he was in the hospital at Research Medical Center.[4] *Id*. at 7. Plaintiff claims that at his second board he was notified that the paperwork he handed to the parole office at MJRCF was not received by the board. *Id*. at 8. Plaintiff claims that he was again evacuated to the hospital and told to mail his documents for his third board, but they were purportedly never received, and this "was the primary reason for the Plaintiff's denial for his 2025 parole board." *Id*. Plaintiff also claims that MJRCF prevents inmates from filing motions to proceed ifp. *Id*. However, Plaintiff filed an ifp motion in this case (Doc. 2), two ifp motions in Case No. 25-3238 (Docs. 2, 5), and an ifp motion in Case No. 25-3275 (Doc. 8).

(Doc. 12, at 7–8.)

The Tenth Circuit has held that the Court's "traditional powers of equity . . . to prevent violations of constitutional rights . . . flow from the long-recognized 'jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.'" *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1106 (10th Cir. 2021) (quoting *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199, 216 (2007), and *Bell v. Hood*, 327 U.S. 678, 684 (1946)). "*Bell v. Hood* held that suits for relief directly under the Constitution fall within [the] grant of jurisdiction" provided by § 1331." *Id*. (citing *Simmat*, 413 F.3d at 1232). "Section 1331 thus provides jurisdiction for the exercise of the traditional powers of equity in actions arising under federal law." *Id*. (quoting *Simmat*, 413 F.3d at 1232).

**A. Exhaustion**

Even in cases where a court has jurisdiction over claims for nonmonetary relief, the Prison Litigation Reform Act ("PLRA") requires exhaustion of administrative remedies prior to bringing

---

[4] Plaintiff filed an action in the Western District of Missouri alleging in his amended complaint that he was treated by Research Medical Center off and on from January 2024 through May 2024. *Askins v. Research Med. Ctr.*, Case No. 26-cv-00095-DGK-P, Doc. 20, at 1–2 (W.D. Mo. 2026).

an action regarding prison conditions.[5] *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (finding that "exhaustion of available remedies is required for any suit challenging prison conditions, not just for suits under § 1983") (citation omitted); *see also Gonzalez v. Ortiz*, 2021 WL 308548, at *2 (D. N.J. 2021) (noting that petitioner could bring a civil rights complaint for injunctive relief under § 1331, "but he must first exhaust administrative remedies under the . . . PLRA"). The PLRA's exhaustion requirement applies to military prisoners. *See Long v. Johnston*, 2022 WL 17177348, at *2 (D. Kan. 2022) (finding that the PLRA's exhaustion requirement applies to military prisoners) (citations omitted)); *see also Murphy v. Hylton*, 2007 WL 1201517, at *3 (D. Kan. 2007) (military prisoner must exhaust under Section 1997e(a) regarding conditions at the USDB).

The bulk of Plaintiff's response to the Report addresses the administrative grievance process at the MJRCF, his dissatisfaction with the process, lost forms, or his claims that procedures are not being followed at the facility. (Doc. 27, at 3–15.) Plaintiff's documents submitted with his Motion to Submit Support Documents at Doc. 28 include memoranda from Inmate Advisory Counsel ("IAC") meetings in 2024 where inmates expressed concerns about digital 510s disappearing or being deleted. (Doc. 28, at 1; Doc. 28–1, at 1–15.) One Memorandum includes a response that "510s are not being deleted . . .." (Doc. 28–1, at 2.) Plaintiff also attached a memorandum from a 2025 IAC meeting dealing with delay in parole and release, but he acknowledges that he "has not directly been affected" and he "did not address this issue in his SAC." (Doc. 28, at 2; Doc. 28–1, at 11–16).

---

[5] In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). "Although a defendant bears the burden of 'proving that the plaintiff did not [exhaust his] administrative remedies,' once the defendant has carried that burden, 'the onus falls on the plaintiff to show that remedies were unavailable to him.'" *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (alteration in original) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)).

Plaintiff claims that there is a pattern of leaving open DD Form 510s, losing them, and not responding to them for in excess of 60 days. (Doc. 27, at 4–5.) Plaintiff claims that "[t]o date, the Plaintiff has never received a memorandum in response to any of the Grievances he has submitted." *Id*. at 7. Plaintiff states that the "policy of prohibiting inmates from having physical possession of DD Form 510(s) including grievances is not only counter to Military Correction Command policies and procedures, but prevent inmate's from complying with the requirement of exhausting; or proving that they have exhausted administrative remedies, under the PLRA." *Id*. Plaintiff claims that on the day of his response, he had 370 closed and 4 open DD Form 510s "visible on his institution provided tablet." *Id*. at 11. Plaintiff also claims that prisoners are not provided with information on how to appeal a grievance and are told once it is closed there is no appeal. *Id*. Plaintiff then attaches DD Form 510s that he claims were obtained through a FOIA request but are not included in the Report. *Id*. at 10–11 (citing attached exhibits 1–1, 1–2, and 1–4, and claiming that his first FOIA request produced one digital 510 and over 40 manual or paper 510s "most of which are not accounted for in the Defendants' report" and his second FOIA request produced in excess of 500 DD Form 510s, including 19 grievances). He claims that "[w]hile there were many duplicates, there was in fact far more than Defendant's *Martinez* Report claims." *Id*. at 10. Plaintiff argues that based on the discrepancies with the DD Form 510s, "[t]he Court should take the Plaintiff's exhausting of administrative remedies as fact." *Id*. at 11.

To the extent Plaintiff makes claims regarding his dissatisfaction with the administrative grievance process at the MJRCF, Plaintiff fails to state a claim. Plaintiff acknowledges that a grievance procedure is in place and that he used it. Plaintiff's claims relate to his dissatisfaction with the grievance system and responses to his grievances. The Tenth Circuit has held several times that there is no constitutional right to an administrative grievance system. *Gray v. GEO*

*Group, Inc.*, 2018 WL 1181098, at *6 (10th Cir. March 6, 2018) (citations omitted); *Von Hallcy v. Clements*, 519 F. App'x 521, 523–24 (10th Cir. 2013); *Boyd v. Werholtz*, 443 F. App'x 331, 332 (10th Cir. 2011); *see also Watson v. Evans*, 2014 WL 7246800, at *7 (D. Kan. Dec. 17, 2014) (failure to answer grievances does not violate constitutional rights or prove injury necessary to claim denial of access to courts); *Strope v. Pettis*, 2004 WL 2713084, at *7 (D. Kan. Nov. 23, 2004) (alleged failure to investigate grievances does not amount to a constitutional violation); *Baltoski v. Pretorius*, 291 F. Supp. 2d 807, 811 (N.D. Ind. 2003) (finding that "[t]he right to petition the government for redress of grievances . . . does not guarantee a favorable response, or indeed any response, from state officials").

The Court will only address Plaintiff's response[6] and the issue of exhaustion as they relate to the remaining claims in this case.

**B. Count I**

As Count I, Plaintiff alleges a violation of his First Amendment right to freely practice his religion and a violation of the Religious Freedom Restoration Act.[7] (Doc. 11, at 3.) For these violations, Plaintiff is seeking the "[r]eturn of all seized religious items and articles, or recompence for those items to the sum of $2,000; damages for the loss, time spent attempting to recover, and consequential injuries therein to the sum of $2,000; and the relief and reassignment of the MWJCRF Commander LTC Proffit, and the dismissal or firing of Deputy Commander Stephen Hansen; sanction(s) or order(s) against the facility for these violations." (Doc. 11–1, at 9.) The

---

[6] Plaintiff continues to argue that he should be able to sue Defendants in their individual capacities. (Doc. 27, at 2–3.) The Court rejects these arguments and has already ruled that any claims against Defendants in their individual capacities are dismissed.

[7] Plaintiff asserts a claim under the Religious Freedom Restoration Act ("RFRA") (42 U.S.C. § 2000bb *et seq.*). RFRA provides that a government may not substantially burden a person's exercise of religion unless it demonstrates that doing so "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1.

Court has already found that Plaintiff is not entitled to monetary damages or Defendants' termination or reassignment.

The Report provides that "Plaintiff submitted two grievances related to religious articles referenced in the SAC, namely, a Valknut and a Havamal." (Doc. 19, at 11.) The Report provides that Plaintiff failed to fully exhaust the grievance, and "also filed a property claim . . . concerning lost religious articles, including the Valknut and Havamal." *Id*. The Report states that "Plaintiff failed to appeal that claim when it was denied by the Fort Leavenworth Claims Office." *Id*.

The Report provides that while housed at the MJRCF, Plaintiff only requested one religious accommodation, which was granted. *Id*. at 14. The Report states that:

> Research revealed that, while at the MJRCF, Plaintiff has requested one religious accommodation, which was granted. Ex. 7 (Askins Religious Accommodation). Specifically, on May 2, 2024, following an interview with a chaplain, "[i]n observance of [Plaintiff's] Norse Pagan (Asatru) faith," he was permitted to "wear a beard in accordance with Army uniform and grooming standards for Soldiers with approved religious accommodations." *Id.* Absent extenuating circumstances, this accommodation remains valid for the duration of Plaintiff's confinement. *Id.* Contrary to allegations in the SAC, Plaintiff continues to don the beard that had been approved prior to his transfer to MCFP-Springfield.
>
> Plaintiff has not submitted any other religious accommodation requests, but may freely do so. Additionally, based on a review of Plaintiff's DD Forms 510, Ex. 6 (Askins Grievance History), Plaintiff has not asked to procure any religious medallions or necklaces—such as, a "Valknut"—in accordance with MJRCF guidance, Ex. 1 (MGI, ¶ 8-2, n. 10). Specifically, inmates may request religious materials/items on a DD Form 510, including, among other sacred tokens, "religious medallions" or "religious necklaces." *Id.* MJRCF regulation, however, places specific limitations on the size and monetary value of such items. *Id.* (specifying that religious medallions/necklaces cannot exceed $75 in value and, in the case of medallions, must be no larger than 1.5 square inches). Further, these religious items may not contain stones. *Id.* While Plaintiff has submitted requests related to a missing religious pendant (or "Valknut"), he has not submitted a DD Form 510 requesting to procure one or to replace it. *See* Ex. 6 (Askins Grievance History) (Request dated April 17, 2024, Control

> Number 1157246); *see also*, *supra*, Table 3 (Line 55).
>
> It also bears noting that, on the DD Form 510 related to the missing "Valknut" and a religious text called a "Havamal," Plaintiff did not assert that these items were deliberately seized based on religious animus, as the SAC suggests. *Id.* Rather, he stated "I assume they are lost." *Id.* Going forward, Plaintiff is strongly encouraged to contact the chaplain to identify and procure a suitable replacement pendant and text that will promote observation of his Asatru faith.

*Id*. at 14–15.

Plaintiff filed a claim relating to his religious items under the Military Claims Act. The Military Claims Act ("MCA"), "allows the Secretary of Defense to settle claims for property damage, personal injury, or death caused by military members." *Luckey v. Hegseth*, 822 F. Supp. 3d 42, 47 (D. D.C. 2026) (citing 10 U.S.C. § 2733). The Report notes that Plaintiff submitted two property claims to the Fort Leavenworth Claims Office ("FLCO"). (Doc. 19, at 16.) Claim No. 26-171-T001 relates to the missing Valknut and Havamal. *Id.* (citing Exhibit 8 at Doc. 19–8). Although Plaintiff seeks $2,000 for these items in his SAC, on the claim form he values them at $145. *See* Doc. 11–1, at 9; Doc. 19–8, at 2. In a December 30, 2025 denial letter, the FLCO advised Plaintiff that his claim was being denied as time-barred and for lack of evidence supporting negligent handling of his property. (Doc. 19–8, at 4–5.) The purported loss occurred in June 2023, and was barred based on the MCA's two-year statute of limitations. (Doc. 19, at 17) (citing Exhibit 8 and 10 U.S.C. § 2733). The letter further advised that, if Plaintiff was dissatisfied with the result under the MCA, he could administratively appeal within 60 days to the U.S. Army Claims Service ("USARCS"). (Doc. 19–8, at 5.) The Report provides that "[n]o such appeal was ever filed—and, as such, Plaintiff has failed to exhaust internal administrative remedies on any claim related to the missing Valknut and Havamal." (Doc. 19, at 17.)

Plaintiff has failed to show a substantial burden on his right to practice his religion. "To

state a valid constitutional claim, a prisoner must allege facts showing that officials substantially burdened a sincerely held religious belief." *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021) (citing *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007)). Likewise, a plaintiff asserting a claim under RFRA must show a substantial burden. *See Mostafa v. Bondi*, 2025 WL 2734116, at *15, and n.30 (D. Colo. 2025) (citations omitted) (noting that plaintiff must show a substantial burden for both RFRA and First Amendment claims).

"A government substantially burdens a person's religious exercise . . . when it (1) 'requires participation in an activity prohibited by a sincerely held religious belief,' (2) 'prevents participation in conduct motivated by a sincerely held religious belief,' or (3) 'places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief.'" *Blair v. Raemich*, 804 F. App'x 909, 917 (10th Cir. 2020) (unpublished) (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010)); *see also Mostafa*, 2025 WL 2734116, at n.31 (noting that although *Abdulhaseeb* dealt with RLUIPA, it is the state equivalent of RFRA and uses the same substantial burden standard) (citing *see Abdulhaseeb*, 600 F.3d at 1312; *see also Johnson v. Martin*, 2005 WL 3312566, at *5 (W.D. Mich. Dec. 7, 2005) ("Save for the inserted congressional limitations and stylistic changes, 42 U.S.C. § 2000cc-1 (RLUIPA) and 42 U.S.C. § 2000bb-1 (RFRA) are functional equivalents."); *Henderson v. Elsinger*, 2022 WL 21808247, at *2 (W.D. Wis. Aug. 19, 2022) ("the Religious Freedom Restoration Act (RFRA) [is] the federal equivalent of RLUIPA"); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ("the Religious Land Use and Institutionalized Persons Act (RLUIPA) [is] a statute that adopts RFRA's 'substantial burden' standard")).

Plaintiff claims that his Valknut and Havamal were taken from him and then subsequently

lost. The Report provides that there is a procedure in place for requesting a new Valknut and Havamal within the MGI guidelines, but there is no indication Plaintiff has requested new items through that process. In his response, Plaintiff does not allege that he has used this procedure. Instead, he acknowledges the option for obtaining new items, but states that it offers "nothing to prevent future or further harm or discrimination at the hands of their Agents." (Doc. 27, at 16.) Plaintiff has not shown a substantial burden on his right to freely practice his religion.

Plaintiff acknowledges in his response that he attempted to file claims under the MCA. (Doc. 17, at 3.) He states that his claims made about the seizure and destruction of his religious items were refused. *Id*. Plaintiff claims that he attempted to resubmit his claims and was told they were dismissed as untimely. *Id*. Plaintiff states in his response to the Report that "[d]ue to the repeated loss of documents and refusal to process timely claims, the Defendant is correct that the Plaintiff's claim was untimely citing 10 U.S.C. 2733." (Doc. 27, at 17.)

The December 30, 2025 letter denying his claim under the Federal Tort Claims Act and his MCA claim states that "you did not provide, nor did the Fort Leavenworth Claims Office's investigation uncover, evidence establishing that negligence by U.S. Army personnel was the proximate cause of your alleged loss." (Doc. 19–8, at 4.) The letter further states that:

> If you are dissatisfied with the result under the MCA, you may administratively appeal. The 60-day time limit to appeal is measured from the time you receive this letter. The appeal should be a letter setting out the factual and /or legal grounds relied upon, contain any supporting documentation and should respond to the issues raised in this letter. In the alternative, you may elect not to submit additional information and state your appeal is based on the record as it existed at the time of this letter. The appeal must be sent to the Commander, U.S. Army Claims Service (USARCS), Office of the Judge Advocate General, 4411 Llewellyn Avenue, Fort Meade, Maryland, 20755-5360. For good cause shown, the Commander, USARCS, at his discretion, or his designee, may extend the time within which to submit such evidence or argument to complete the appeal. The extension normally will not exceed 90

> days. Any request for an extension to submit appellate materials must be included in the appeal letter or sent under separate cover no later than 60 days after receipt of this letter. Nothing in the above should be construed to imply than an appeal, if made, would be successful.

*Id*. at 5. The letter also provides contact information for "any questions or concerns." *Id*. The Report provides that Plaintiff failed to appeal the MCA decision. (Doc. 19, at 11.)

Plaintiff argues that the deadline on his MCA claims should be tolled and asks this Court to order the JCRF to "handle the harms done in this case under 10 U.S.C.S. 2731." (Doc. 17, at 4.) Plaintiff's claim based on the loss of his religious items was denied as untimely and due to no finding of negligence. Plaintiff has not suggested that he appealed the decision through the procedure set forth in the December 30, 2025 letter. Section 2735 provides that "[n]otwithstanding any other provision of law, the settlement of a claim under section 2733, 2733a,2734, 2734a, 2734b, or 2737 of this title is final and conclusive." 10 U.S.C. § 2735; *see also Labash v. U.S. Dep't of Army*, 668 F.2d 1153 (10th Cir. 1982), *cert. den.* 102 S. Ct. 2299, 456 U.S. 1008 (finding that neither the district court nor the court of appeals had jurisdiction to review settlement by the Secretary of the Army of a medical malpractice claim under this chapter, absent a sufficiently pleaded allegation that a cognizable constitutional right had been violated).

Thus, the MCA contains a finality provision: "[n]otwithstanding any other provision of law, the settlement of a claim under . . . [the MCA] is final and conclusive." *Luckey v. Hegseth*, 822 F. Supp. 3d 42, 47–48 (D.C. Cir. 2026) (citing 10 U.S.C. § 2735 and assuming without deciding that exceptions may apply, including where there is a violation of a clear statutory mandate and where a plaintiff's constitutional rights are violated ). "Under the MCA, to 'settle' means to 'consider, ascertain, adjust, determine, and dispose of a claim, whether by full or partial allowance or by disallowance." *Id*. at 47 (citing 10 U.S.C. § 2731).

Plaintiff has not cited any authority for this Court to toll his MCA claim, which appears to be final. Although Plaintiff claims that DD Form 510s were not responded to or were deleted, and that inmates were not allowed to possess physical copies of their DD Form 510s, nothing in his response indicates that he attempted to appeal the denial of his MCA claim using the process set forth in the December 30, 2025 letter. *See* Doc. 27, at 4–11, 13. He states that "[g]iven that the Defendant had through their repetitive negligence or malice given cause to documents being lost and destroyed; the Plaintiff did accept defeat, and the loss of his property." *Id*. at 17.

Plaintiff has failed to allege a substantial burden on his right to freely practice his religion, and has failed to show that the MCA claim is not final. Plaintiff should show good cause why his First Amendment and RFRA claims in Count I should not be dismissed for failure to state a claim.

**C. Count II**

As Count II, Plaintiff alleges an Eighth Amendment violation based upon the alleged denial of medical care and basic amenities, and indefinite isolation in the SHU. (Doc. 11, at 3.) As support for this claim, Plaintiff alleges that while he was housed at MCFP Springfield: 1) he was denied medical care because the MJRCF refused to share Plaintiff's medical records with MCFP Springfield; 2) he was denied access to his appellate attorney(s) for the majority of his time at MCFP Springfield; and 3) all paperwork including administrative remedies, medical records requests, parole packets, appeal paperwork, and others were lost, destroyed, or intentionally misplaced by MJRCF. (Doc. 11–1, at 3.) Plaintiff alleges that the MJRCF should be responsible for his care at MCFP Springfield because the MJRCF retained sole legal custody of Plaintiff and he was only in physical custody of the BOP while housed at MCFP Springfield. *Id.*

Plaintiff claims that when he returned to the MJRCF in May 2025, he was placed in SQ for eight days for "medical isolation." *Id*. at 4. Plaintiff claims that during this time he was denied

access to recreation facilities, the law library, and "legal access to include attorneys." *Id*. Plaintiff claims that he was denied the ability to bathe, he was denied basic medications, and there was a "seizure of all property to include legal and religious items, and other property." *Id*. Plaintiff states that the Deputy Commander visited Plaintiff on two of the days while he was housed in the SQ, and expressed that he did not want Plaintiff to return to the MJRCF. *Id*.

Plaintiff also claims that around August 2025, Plaintiff was shackled in the bed while in the hospital. *Id*. at 5. Plaintiff alleges that when he asked to use the restroom, the Military Police escort called the MJRCF for permission to allow Plaintiff to use the restroom, and the Watch Commander stated that she did not have authority to allow Plaintiff to use the restroom. Plaintiff claims that after six hours, he was forced to defecate on himself and then after that the Watch Commander allowed him to use the restroom. *Id*.

For the alleged Eighth Amendment violation in Count II, Plaintiff seeks $5,000 in damages, "the relief and reassignment of the MWJCRF Commander LTC Proffit, and the dismissal or firing of Deputy Commander Stephen Hansen; [and] sanction(s) or order(s) against the facility for these violations. *Id*. at 10. Plaintiff does not seek any specific injunctive relief in Count II.

The Report provides that:

> Plaintiff placed approximately 11 requests related to medical needs or policies, which were also met with responses and, where possible, servicing Plaintiff's needs.
>
> > o Notably, Line 31 (Control No. 589419761, August 5, 2025) reflects a request seeking to change MJRCF policy related to security protocols governing escorts. Specifically, Plaintiff asked to modify a correctional escort policy after a purported incident where Plaintiff claims he defecated on himself and was "shackled in a bed in [his] own mess." Ex. 6 (Askins Grievance History). This DD Form 510 appears to relate to allegations for Count 2 of the SAC, which allegedly occurred in August 2025. Doc. 11–1, at 5. If this type of an event had occurred, it would have been documented in an Observation Report ("OR"). A diligent

> search revealed no ORs for any time period matching these facts. Additionally, a medium-security level inmate (like Plaintiff) would wear a restraint known as a "body cuff" for an external appointment according to MCC policy—and this restraint is designed so as to permit for normal evacuation.
>
> o In addition to these requests, Plaintiff's ACIS report, Ex. 1, reflects numerous occasions when MJRCF medical staff, typically prompted by Plaintiff, intervened to provide care and services, including on an emergent basis. As Table 1, *supra*, reflects, these interventions led to approximately eight admissions at external hospitals as well as release to MCFP-Springfield for approximately a year so Plaintiff could receive stabilizing care for his conditions at the U.S. Medical Center. That Plaintiff sought medical help from the MJRCF staff undermines allegations claiming he declines medical care out of fear of retaliation.
>
> o Additionally, the ACIS report reflects approximately six external medical appointments, *id.*, which is in addition to the in-house care Plaintiff receives at the MJRCF.

(Doc. 19, at 10–11.) The only issue Plaintiff disputes in his response relates to the use of the body cuff for transporting Plaintiff. Plaintiff claims that "when the Plaintiff had bouts of pancreatitis the medical staff had instructed the escorts to **NOT USE** the body cuff as it was a potential hazard to the Plaintiff's health and life." (Doc. 27, at 14.)

The Report includes a list of periods when Plaintiff was admitted to external medical facilities outside of the MJRCF. (Doc. 19, at 3.) The Report provides that at times Plaintiff's heightened medical needs demanded housing in "Special Quarters" or "SQ"—which is therapeutic and not punitive. *Id*. at 19 (citing Exhibit 1, Doc. 19–2 "Manual for the Guidance of Inmates" at ¶ 9–2(a)).[8] The Report notes that "in a DD Form 510 dated April 25, 2024 (Control No. 1157406),

---

[8] The Manual is Exhibit 1 to the Report, located at Doc. 19–1. Paragraph 9–2(a) states that:

> If determined necessary by an HCP or MHCP, inmates may be housed in SQ if their emotional state, adjustment to confinement, mental, or physical characteristics warrant such action; or if their medical or behavioral health condition make them unsuitable to be housed elsewhere in general population or the SHU. Inmates may also be placed on SQ for pre-operative preparation or post-operative recovery as recommended by the HCP and the Health Authority. SQ inmates are removed from SQ status when the HCP or MHCP has determined the condition for SQ no longer exists.

Doc. 19–2, at 141; *see also* Doc. 19, at n.15 (noting that HCP refers to health care providers and MHCP refers to

Plaintiff described SQ as 'medical segregation,' rather than punitive isolation as the SAC suggests." *Id*. at 19.

The Report provides that Plaintiff's longest stay in SQ followed his return from MCFP Springfield, and lasted from May 22, 2025, until approximately July 28, 2025, "and diligence conducted for this Special Report revealed that SQ was medically necessary according to Plaintiff's HCPs." *Id*. at 20. During that period, Plaintiff was also admitted to a local hospital for three days. *Id*. at n. 16 (citing Table 1, admission to St. John's Hospital from July 18–20, 2025). The Report provides that:

> The principal purpose for this lengthy stay in SQ was to support the HCPs' effort to titrate Plaintiff's medication regiment, which needed to be at a more appropriate level before being returned to the general population. Additional details regarding such titration are reflected at pages 483 and 488 in Plaintiff's bates-stamped medical records filed under seal as Exhibit 10 to this Special Report to protect his private health information. These records as a whole, which speaks for itself, demonstrate that the MJRCF prioritizes inmate care, including in Plaintiff's case. Further, these records do not support that Plaintiff is declining care for fear of retaliation. Additionally, HCPs at the MJRCF have also secured emergent and long-term care to address Plaintiff's specific needs at more specialized facilities, as reflected above, *supra*, Table 1. Further, Exhibit 10 shows communication between the MJRCF and external facilities to promote continuity of care. *E.g.*, Ex. 10 (Sealed Medical Records, -158, -172, -224, -337–38, -341, -346).

*Id*. at 20.

The Report states that inmates housed in the SHU or SQ still have access to law library materials. *Id*. In SQ, legal materials are even more accessible because inmates are provided access to legal materials with a bedside computer cart. *Id*. at 21. Also, they may actually attend the library subject to their health care limitations. *Id*. In one of his inmate requests, Plaintiff acknowledged that he attended the library while housed in SQ. *Id*. (noting that on his DD Form

---

mental health care providers).

510 from April 25, 2024, Plaintiff explained "I am on SQ (medical segregation) and can attend Library, and other non strenuous appointments[.]"). In his response, Plaintiff alleges that since he arrived at the MJRCF in 2023, the library cart has been nonoperational. (Doc. 27, at 19.) Plaintiff argues that for the eight days he was in SQ following his return to the MJRCF, he was not allowed a tablet to submit digital 510s, use of the law library cart, or to even bathe himself. *Id*.

Plaintiff does not seek any specific injunctive relief in Count II. He also fails to state an Eighth Amendment violation. A prison official violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id*. To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005). The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834. Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety. *Id*. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*. It is not enough to establish that the official should have known of the risk of harm. *Id*.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). However, Plaintiff points to no medical care that he requested or needed that was denied. He makes general complaints about his medical care

at MCFP Springfield, alleges that he was forced to defecate on himself on one occasion while hospitalized, and takes issue with being housed in the SQ. However, the SQ is designed for prisoners needing medical care and placement in the SQ is determined by health care providers.

In his response, Plaintiff alleges that his placement in SQ "cannot be considered to have been done for the Plaintiff's benefit." (Doc. 27, at 18.) He claims that he was often forced to miss or go without needed medication, "some days being forced to kick the doors when 31E's; military correction specialists, would forget to bring the Plaintiff food at meal times." *Id.* Plaintiff points to no specific instances. In his SAC, he claims that this occurred during his eight-day stay in SQ following his return from MCFP Springfield. (Doc. 11–1, at 4.) Because the sufficiency of a conditions-of-confinement claim depends upon "the particular facts of each situation; the 'circumstances, nature, and duration' of the challenged conditions must be carefully considered." *Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (quoting *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)). "While no single factor controls . . . the length of exposure to the conditions is often of prime importance." *Id.* As the severity of the conditions to which an inmate is exposed increases, the length of exposure required to make out a constitutional violation decreases. Accordingly, "minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations. . .' may meet the standard despite a shorter duration." *Id.* (citations omitted). Plaintiff has failed to show that his conditions in SQ violated the Eighth Amendment.

Plaintiff takes issue with being housed in SQ—a housing determination made by health care providers. A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968)

(prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983). Furthermore, Plaintiff does not have a constitutional right to dictate where he is housed, whether it is which facility or which classification within a facility. *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29; *Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007). Moreover, prison officials are entitled to great deference in the internal operation and administration of the facility. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

Plaintiff has failed to allege that any staff at the MJRCF were deliberately indifferent to his medical needs, or that he was incarcerated under conditions posing a substantial risk of serious harm. Plaintiff must show good cause why his claims in Count II should not be dismissed for failure to state a claim.

**D. Count III**

As Count III, Plaintiff alleges a violation of the Fifth, Sixth, and Fourteenth Amendments based on the destruction of over 200 administrative remedies, parole packets, EO Complaints, and the denial of access to counsel and appeals. (Doc. 11, at 3–4.) Plaintiff also alleges that this violated 5 U.S.C. § 552 and 10 U.S.C. § 952. *Id*. at 4. For these violations, Plaintiff seeks "damages for the loss of administrative remedies, parole packets, direct interference and intentional disruption with appeals, and refusal to comply with Court mandated paperwork; damages to the sum of $15,000; the relief and reassignment of the MWJCRF Commander LTC Proffit, and the dismissal or firing of Deputy Commander Stephen Hansen; sanction(s) or orders(s)

against the facility for these violations." (Doc. 11–1, at 9–10.) Plaintiff does not seek any specific injunctive relief in Count III.[9]

**1. Court Access**

Plaintiff does not cite the First Amendment, but his allegations suggests that he might be claiming he was denied court access. He claims that he was denied access to counsel and appeals. Plaintiff has not pointed to any specific instance when he was allegedly denied access to counsel or his appeals. Regarding the denial of access to counsel and appeals, Plaintiff's only claim in his SAC is that when he was transferred to the BOP facility at MCFP Springfield, he was "[d]enied access to his Appellate attorney(s) for the majority of his time at MCFP Springfield, and subsequently barred from participating in his appeal(s) and parole hearing." *Id*. at 3.

The Report addresses Plaintiff's appeal of his military convictions as follows:

> Plaintiff, through military appellate defense counsel, is continuing to challenge these convictions on direct appeal to the Army Court of Criminal Appeals ("ACCA") and the Court of Appeals for the Armed Forces ("CAAF"). After raising multiple appellate issues, the ACCA held oral argument on June 18, 2025.[] On August 25, 2025, the ACCA consolidated two offenses, affirmed the consolidated and other remaining offenses, and affirmed the sentence. *Id*. On October 20, 2025, the CAAF granted the Plaintiff's request to file a Petition for a Grant of Review and ordered briefing. *United States v. Askins*, 86 MJ. 357 (C.A.A.F. 2025); *United States v. Askins*, 86 M.J. 368 (C.A.A.F. 2025). On May 19, 2026, CAAF heard oral argument from Plaintiff's military appellate defense counsel. *United States v. Askins*, __ M.J. __, No. 26-0014/AR, 2026 CAAF LEXIS 172 (C.A.A.F., May 19, 2026). The case is pending decision.[]

---

[9] In addition to the *Feres* doctrine, the PLRA bars compensatory damages absent a physical injury. 42 U.S.C. § 1997e(e); *see also Woodward v. Shaw*, 2026 WL 406677, at *3 (D. Kan. 2026) (noting that it is unclear whether any potential claim for property damage could survive § 1997e(e)) (citing *Ybanez v. Scott*, 2015 WL 1258290, at *7 (D. Colo. March 17, 2015) (noting that the 10th Circuit does not appear to have addressed the issue of whether 1997e(e) bars an award of compensatory damages for the loss of property, but in *Allen v. Reynolds*, 475 F. App'x 280, 283–84 (10th Cir. 2012), the court appeared to reject, in *dicta*, an argument that an inmate's demand for compensatory damages for the destruction of personal photographs survived the lack of a physical injury under the PLRA); *see also Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (finding in case involving confiscated magazines that inmate did not suffer physical injury in connection with his constitutional claims, and allegation that personal property was lost, confiscated, or damaged does not state a claim where remedy is in state court)).

(Doc. 19, at 4) (footnotes omitted). The Report includes a list of twelve other cases Plaintiff has pursued in other courts while housed at the MJRCF.[10] *Id*. at 5. The list does not include Plaintiff's appeals of his military conviction, the multiple Military Claims Act ("MCA") property claims pursued by Plaintiff internally at the MJRCF, or Plaintiff's 215 inmate requests. *Id*. at 4–5 ("In addition to the aforementioned criminal appeals (where Plaintiff has appointed military defense counsel), the instant *pro se* civil lawsuit, and a lengthy divorce proceeding, Plaintiff has been actively filing civil lawsuits in multiple jurisdictions during his incarceration at the MJRCF."). The Report states that a review of Plaintiff's DD Forms 510, shows that the MJRCF has satisfied its responsibility to schedule attorney visits and calls for Plaintiff. *Id*. at 21–22 (pointing to Plaintiff's court-martial appeals, thirteen federal civil lawsuits, two property claims with the FLCO, and the MJRCF's response to Plaintiff's FOIA requests). The Report also states that the MJRCF has not impeded his ability to seek parole or clemency, which is discretionary. *Id*. at 22. "Plaintiff has engaged the Army Clemency and Parole Board ("ACPB") to request parole, clemency, and other relief (such as restoration and reenlistment)." *Id*. (citing Exhibit 12).

The Report provides that while in MJRCF custody Plaintiff has submitted approximately 215 requests using the DD Form 510. *Id*. at 9. The Report includes as Exhibit 6—Plaintiff's DD Form 510 History. *See* Doc. 20–1. The Report provides that "Plaintiff has a tablet through which he may submit digital DD Forms 510; the tablet also allows him to review prior digital submissions. . . . [w]hen Plaintiff views a prior electronic submission, it is recorded on the form." (Doc. 19, at 9.)

[10] In his response, Plaintiff argues that the list of his twelve civil cases is not accurate because some of the cases cited where the same case that was filed after a prior case was dismissed without prejudice, and two cases represent the same case that was filed and then transferred to a different court. (Doc. 27, at 2–3.) Based on Plaintiff's response, he was still able to file at least eleven cases.

The Report states that of Plaintiff's 215 requests, only eight are grievances, and only six appear relevant to the allegations in the SAC. *Id*. at 10. The Report provides that Plaintiff failed to satisfy exhaustion requirements by appealing any of these grievances to the Deputy (or the Commander). *Id*. The Report provides:

> - Plaintiff placed over 90 requests related to his myriad legal issues.
>     - o This included over a dozen requests for legal assistance related to landlord-tenant issues (which pre-date confinement), insurance claims (which also appear to pre-date confinement), tax filings, a burglary in Oklahoma, and other matters.
>     - o There were also over 40 requests for contacts with military counsel, for which MJRCF officials diligently scheduled meetings and coordinated passes as needed.
>     - o Additionally, at least three requests related to Plaintiff's in forma pauperis forms, which MJRCF has also accommodated.
>     - o Finally, Plaintiff has one grievance and one request related to an "EO" (or "Equal Opportunity") complaint. The grievance, as Table 3 (Line 70) reflects, was not fully exhausted. Further, in connection with this Special Report, a diligent search was conducted to locate an EO case or complaint (whether open or closed) for Plaintiff; none was found.

*Id*. at 10.

It is well-established that a prison inmate has a constitutional right of access to the courts. However, it is equally well-settled that in order "[t]o present a viable claim for denial of access to courts, . . . an inmate must allege and prove prejudice arising from the defendants' actions." *Peterson v. Shanks,* 149 F.3d 1140, 1145 (10th Cir. 1998) (citations omitted); *Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("The requirement that an inmate . . . show actual injury derives ultimately from the doctrine of standing.").

An inmate may satisfy the actual-injury requirement by demonstrating that the alleged acts or shortcomings of defendants "hindered his efforts to pursue" a non-frivolous legal claim. *Lewis*,

518 U.S. at 351-53; *see also Burnett v. Jones*, 437 F. App'x 736, 744 (10th Cir. 2011) ("To state a claim for violation of the constitutional right to access the courts, a prisoner 'must demonstrate actual injury . . .—that is, that the prisoner was frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement.'") (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010)).

The Supreme Court plainly held in *Lewis* that "the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 at 354. Rather, the injury occurs only when prisoners are prevented from attacking "their sentences, directly or collaterally" or challenging "the conditions of their confinement." *Id.* at 355. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*. (emphasis in original); *see also Carper v. DeLand*, 54 F.3d 613, 617 (10th Cir. 1995) ("[A]n inmate's right of access does not require the state to supply legal assistance beyond the preparation of initial pleadings in a civil rights action regarding current confinement or a petition for a writ of habeas corpus.") (citations omitted).

Plaintiff has not alleged that staff at the MJRCF prevented him from accessing the courts or caused him actual injury. The claim is not plausible, particularly since he was able to file this action in federal district court and the actions set forth in the Report. Any court access claim that Plaintiff may assert is subject to dismissal for failure to state a claim.

**2. Loss of Documents**

Plaintiff's remaining claims in Count III concern the loss of documents. Plaintiff claims that while at MCFP Springfield "[a]ll paperwork including administrative remedies, medical records requests, parole packets, appeal paperwork, and others were lost, destroyed, or intentionally misplaced by the MWJCRF." (Doc. 11–1, at 3.) However, Plaintiff pursued this

claim through the MCA. Plaintiff acknowledges in his response that he attempted to file claims under the MCA, and was told by the facility "that no financial loss could be claimed about the seizure and destruction of legal documents." (Doc. 17, at 3.)

The Report states that Plaintiff filed a property claim to the FLCO regarding his missing papers and texts. (Doc. 19, at 17) (citing Army Claim No. 26-171-T024 at Exhibit 9, Doc. 19–9). On March 1, 2026, Plaintiff signed a certified claims form (the SF-95) seeking $750 for missing items, including legal papers, legal texts, and religious articles. *Id*. "Plaintiff asserted that the date of loss was May 2025 . . . which coincided with Plaintiff's transfer from MCFP-Springfield back to the MJRCF following an extended hospital stay."[11] *Id*. "In a written attachment to the certified SF-95, Plaintiff further explained that items went missing during the transfer, and he was only 'partially successful' in recovering some of his belongings." *Id.* "In April 2026, after consulting the FLCO, Plaintiff increased the amount of his claim from $750 to $840." *Id*.

The Report provides that the FLCO investigated the claim but could not locate relevant inventories for Plaintiff's return to the MJRCF in May 2025, or the actual property at issue in the claim. *Id*. at 18. "[I]n a letter dated May 5, 2026, the FLCO offered $545 to settle Plaintiff's lost property claim, which Plaintiff accepted." *Id*. The letter expressly stated that "accepting this offer constitutes a full and final settlement of your claim" and "no additional claims or requests for compensation will be entertained for this loss." *Id.*

Plaintiff executed a DA Form 7500 ("Tort Payment Report") on May 18, 2026, electing to receive the full and final settlement payment of $545 for the claim via check. *Id*. Immediately above Plaintiff's signature is a comprehensive release, which states in full:

> I, the claimant, do hereby accept the within-stated award, compromise, or settlement as final and conclusive on my heirs,

[11] Plaintiff was in BOP custody at the U.S. Medical Center (MCFP Springfield) from May 29, 2024, through May 20, 2025. *See* Doc. 19, at 3.

> executors, administrators or assigns, and **agree that said acceptance constitutes a complete release by me**, my heirs, executors, administrators or assigns of any and all claims, demands, rights, and causes of action of whatsoever kind and nature, arising now or in the future from, and by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries (including wrongful death), damages to property, breaches of contract or law, and any other acts or omissions, and the consequences therefrom resulting, and to result, from the same subject matter that gave rise to the claim for which I or my heirs, executors, administrators, or assigns, and each of them, now have or may hereafter acquire against the United States and against the employee(s) of the Government whose acts or omissions gave rise to the claim by reason of the same subject matter. I further agree to reimburse, indemnify and hold harmless the United States, its agents, servants and employees from any and all claims or causes of action, including wrongful deaths, that arise or may arise from the acts or omissions that gave rise to the claim(s) by reason of the same subject matter.

*Id.* (emphasis added). "Following Plaintiff's execution of the DA Form 7500, payment was made to Plaintiff by check, which cleared on or about June 8, 2026." *Id.*

Plaintiff acknowledges in his response that he settled this claim, but argues that it was only for the items in that claim that were destroyed in May 2025, and does not include the religious materials and legal materials seized in 2023. (Doc. 27, at 18.)

The Report provides that although Plaintiff has fully released the United States from liability for claims relating to missing legal papers and texts, "to the extent he seeks physical copies of his DD Forms 510, they are appended hereto as Exhibit 6 to the Special Report . . . [and] [a] printed copy of the same will be provided to Plaintiff, which should resolve any of Plaintiff's outstanding concerns about procuring a physical replacement." (Doc. 19, at 18.)

Plaintiff must show good cause why any court access claim should not be denied for failure to state a claim. Plaintiff must also show good cause why his claims regarding lost documents are not barred by his settlement and release under the MCA.

**3. Due Process**

Plaintiff claims that the loss of his parole packets denied him due process. Because Plaintiff claims that the loss of his parole packets occurred from 2024 to 2026, it seems likely that they are covered under his settlement and release under the MCA. Regardless, he has not shown that his due process rights were violated.

"Where a liberty or property interest has been infringed, the process which is due under the United States Constitution is that measured by the due process clause, not prison regulations." *Brown v. Johnston*, 2021 WL 4206330, at *9 (D. Kan. 2021) (quoting *Brown v. Rios*, 196 F. App'x 681, 683 (10th Cir. 2006) (unpublished) (citations omitted); *see also Sandin v. Connor*, 515 U.S. 472, 481–82 (1995) (stating that prison regulations are "not designed to confer rights on inmates" and are "designed to guide correctional officials in the administration of a prison")).

"Release from confinement prior to expiration of a military inmate's full sentence may be possible by way of parole . . .." *Maze v. Ledwith*, 2015 WL 5125444, at *6 (D. Kan. 2015) (citing *Huschak v. Gray,* 642 F.Supp.2d 1268, 1273 (D.Kan.2009)). A military prisoner "has no liberty interest in release on parole in the military system . . . [e]arly conditional release of a military prisoner is discretionary." *Id.*; *see also DeLacruz v. Curtis*, 2025 WL 238869, at *2 (D. Kan. 2025) (stating that "no procedural due process rights attach in the context of parole proceedings") (citing *Artis v. United States Dept. of Justice*, 166 F. Supp. 2d 126, 131 (D.N.J. 2001)); *see also McNutt v. Sherrod*, 2009 WL 1174620, at *4 (D. Colo. 2009) (stating that petitioner "does not have a liberty interest in the 'possibility of parole' under the military parole system") (citing *Artis*, 166 F. Supp. At 131) ("Inasmuch as the military parole regulations do not create any liberty interest in parole release, Petitioner does not have any procedural due process rights under that system["])).

Plaintiff must show good cause why any due process claim should not be denied for failure to state a claim.

**4. Fifth and Sixth Amendments, 5 U.S.C. § 552, and 10 U.S.C. § 952**

Plaintiff fails to clarify his claims under these amendments and statutes. If Plaintiff is raising a claim under the Takings Clause of the Fifth Amendment, he fails to state a claim. "The Takings Clause of the Fifth Amendment provides that 'private property [shall not] be taken for public use, without just compensation.'" *Hines v. Ferguson*, 2019 WL 3504239, at *3 (E.D. Pa. 2019) (citing *Nat'l Amusements Inc. v. Borough of Palmyra,* 716 F.3d 57, 63 (3d Cir. 2013) (quoting U.S. Const. amend. V) (alteration in original)).

Nothing in the SAC suggests that his property was taken for a public purpose. *See id.* (where inmates alleged that property was destroyed, lost, or left in disarray after their transfer to a different facility, court found that "[n]othing in the Complaint suggests that Hine's property was taken for a public purpose"). Accordingly, the Takings Clause is not implicated. *Id*. (citations omitted). Plaintiff should show good cause why his Fifth Amendment claim should not be dismissed for failure to state a claim.

The Sixth Amendment provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend VI. "The Sixth Amendment right to effective assistance of counsel does not apply to civil litigation . . .." *Birch v. City of Atchison, Kansas*, 840 F. App'x 365, 366–67 (10th Cir. 2021) (unpublished) (citations omitted). The Sixth Amendment provides rights for criminal

defendants. Plaintiff fails to allege how his Sixth Amendment rights were violated.

Plaintiff also cites to 5 U.S. C. § 552 and 10 U.S.C. § 952. The FOIA, 5 U.S.C. § 552, empowers federal courts to order an "agency" to produce "agency records improperly withheld" from an individual requesting access. 5 U.S.C. § 552(a)(4)(B). Section 952 provides that "[t]he Secretary concerned may provide a system of parole for offenders who are confined in military correctional facilities and who were at the time of commission of their offenses subject to the authority of that Secretary." 10 U.S.C. § 952(a). Plaintiff has failed to allege how these statutes were violated or explain how he has a cause of action under those statutes.

A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Id.* at 555, 570. Plaintiff must show good cause why any claim under these amendments or statutes should not be dismissed for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Appointment of Counsel (Doc. 26) is **denied without prejudice.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Submit Support Document (Doc. 28) is **granted** to the extent that the Court has considered the attached documents as part of Plaintiff's response to the M&O and to the Report.

**IT IS FURTHER ORDERED** that Plaintiff's requests for monetary damages and requests

to have Defendants terminated, reassigned, or criminally charged are **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's individual capacity claims and claims against Defendant Hansen are **dismissed**.

**IT IS FURTHER ORDERED** that Plaintiff is granted until **November 9, 2026,** in which to show good cause, in writing to the undersigned, why his remaining claims should not be dismissed for the reasons set forth in this Memorandum and Order. Failure to respond by the deadline may result in dismissal of this case without further notice.

**IT IS SO ORDERED**.

**Dated October 9, 2026, in Kansas City, Kansas.**

**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**